PASKVAN *v.* ALLOUEZ MINING CO.

1. PLEADING—NEGLIGENCE—MASTER AND SERVANT—INSPECTION—MINES.

Where decedent was fatally injured in getting into a skip or tram car used to carry the employees to and from their work in its mine, and in plaintiff's declaration it was averred that the employer was bound to provide and maintain a proper signaling apparatus, including a reasonably safe signal bell line and bell for the purpose of notifying and conveying signals from the men underground to the engineer, that the defendant negligently failed to furnish and maintain a suitable signaling apparatus and negligently failed to inspect and repair the same, evidence as to want of inspection and the testimony of a witness as to its condition and failure to inspect was admissible in support of the allegations.

2. SAME—NEGLIGENCE—INSPECTION—PROXIMATE CAUSE.

 Testimony that defendant maintained a bell signal system for the operation of its tram car or skip, connected at the mouth of the mine with a puffer engine, that at the time decedent was injured the car was about to stop and take in a number of employees and that the signals given by the operator were not obeyed and the car behaved in an erratic manner, passing beyond the stopping point, that there was no proper inspection of the signaling apparatus but that the signals were given and in part followed by the operator of the engine, there being no proof that the signaling apparatus did not work or that failure to inspect contributed to the accident: *held*, to warrant a verdict for the defendant by direction of the court, since it was a matter of speculation what had caused the erratic movement of the car and a reasonable explanation or inference being that the engineer misapprehended the signals or mismanaged the movement of the hoist so as to result in the accident to plaintiff's decedent.

Error to Keweenaw; Cooper, J., presiding. Submitted June 20, 1913. (Docket No. 69.) Decided July 23, 1915.

Case by Dala Paskvan, as administratrix of the estate of Matt Paskvan, against the Allouez Mining Company for the unlawful killing of plaintiff's intestate. Judgment for defendant on a verdict directed by the court. Plaintiff brings error. Affirmed.

*Le Gendre & Driscoll,* for appellant.

*Allen F. Rees* (*Deen L. Robinson* and *Albert E. Petermann,* of counsel), for appellee.

OSTRANDER, J. Plaintiff, as administratrix, sued defendant to recover for personal injuries sustained by her intestate husband. At the close of plaintiff's case, the court, on motion of defendant, directed a verdict in its favor, upon which a judgment was entered. Upon writ of error the case is before this court for review.

The following are the facts in the case: .

On Saturday, April 29, 1911, this injury occurred in shaft No. 2, at the eighteenth level of defendant's Allouez copper mine, in Keeweenaw county. . This is what is known as a two-department shaft, and the eighteenth level was about 2,700 feet below the surface. This shaft, from a point at or near the surface, dipped toward the west at an angle of about 80 degrees until about the fifteenth level, and then angled about 38 degrees.

"There were seven levels in the mine at that time. They were sinking for the twentieth level, so the nineteenth was then the bottom opened level. Other levels were above that."

These levels were numbered from the top down, averaging about 100 feet apart. There were two skip tracks in this shaft, one in each compartment. The skips were the receptacles used to hoist out ore which was mined out in the several levels and delivered at the shaft in tram cars, and were the means by which the men who worked in the mine were let down to and drawn up from the places where they worked. They ran on wheels and were lowered and hoisted upon the inclined skip tracks by an engine, drum, and cable. One end of the cable was attached to the drum in the engine house on the surface and passed over sheave wheels in the shaft house down to the bail of the skip. The engine house and drum were about 200 feet from the mouth of the shaft.

North of the north skip track in the shaft were ladders by means of which the men sometimes went up and down. North of the ladders was the air pipe line. North of the skip track was also the signaling apparatus, called the bell line, made of wire, with a weight on the end of it in the engine house, and other weights were attached to it along the shaft. There was a lever at each level connected with the wire for the purpose

of signaling the engineer.  To signal the engineer in the engine house on the surface, these levers were operated by hand.  The company had a code of signals for use in this shaft.  One bell was the signal to stop. A bell and a half was the signal to hoist slowly.  Five bells was the signal to hoist the men out.  If the signaling apparatus was in working order, pulling the lever out once and letting it go back would ring one bell in the engine house.  Pulling the lever out once and letting it go back and then pulling it out and holding it would be a bell and a half.  This bell and a half signal to hoist slowly was used in bringing up the men; and when the operator let the lever go back the second time the skip was stopped at the level.  Pulling the lever out and letting it go back five times would be five bells.  This signal was given when the men were in the skip ready to be hoisted out.  The one in question was a three-ton skip.  Its size was about eight feet in length, five feet across, and about four feet deep.  The body of it was in the shape of a box with a lip on it.  There was no device on the skip to stop it or hold it in the shaft.  It was held only by the cable and machinery above described.  It was operated from the bottom to the surface, in bringing out the men, upon the code of signals above described.

The day this accident happened was Saturday.  On that day all of the men working in this mine quit work at about 12 o'clock noon, and do not return to work until Monday.  Plaintiff's decedent on the day in question was working with his partner in the nineteenth level on the north side of the shaft, and about 200 feet from it.  They quit work about 12 o'clock and went by way of the ladders up to the eighteenth level, at which place were 14 or 15 men waiting to get into the skip to be hoisted to the surface, as was customary. The skip had gone down past the eighteenth level, when witness Kemp operated the lever at that level, so as to

give the one bell signal to stop it. It stopped at about the nineteenth level. After it stopped, Kemp with the lever gave the one bell and a half signal to hoist. The skip then started upward toward the eighteenth level. Kemp then turned the lever over to Mataja, who was to remain and give the other necessary signals to hoist the men out and then go up the ladder to the next level. The skip rose, approaching the eighteenth level very slowly. When it was about six inches or a foot below the platform, Mataja released the lever to give one bell to the engineer, which was the signal to stop. There is a dispute in the testimony whether or not the skip stopped on this signal. This witness testified that it gave a jump as if it was off the track and started up rapidly, when he immediately signaled it twice to stop, which it did about 45 feet above the eighteenth level. When the skip approached this level, four or five of the men at once got into it, as they were accustomed to do before it stopped. There is evidence in the case tending to show that the skip stopped at this level for a short time, and that, after it stopped, it jerked and went up, and also that plaintiff's decedent, before the skip started, had hold of the bail of the skip with his hand for the purpose of getting into it.

Nobody saw how plaintiff's decedent was injured. After the skip passed up, he was seen holding onto the timbers, crying out for some one to hold him or he would fall. He was taken down and found to be severely injured. The skip came back, and he was taken up in it and soon taken to the hospital, where he died within five hours after the injury. A piece of his trousers was found on or near the rail, having the appearance of having been run over. There was some blood at the same place and some on the dividing timber on the south side.

The errors assigned and relied upon in this case relate:

*First,* to the rulings of the court on the trial; and, *second,* to the direction of a verdict for defendant by the court.

Most of the witnesses called by plaintiff were in the employment of defendant company at the time of the accident and of the trial. Among these was Rudolph Kemp, who was present in this shaft at the time of the injury to plaintiff's decedent and operated the signaling lever for the first two signals and then turned it over to Mataja to give the others. He testified at length relative to the circumstances which occurred at that time and place. He also testified that for two years he had operated a puffer engine at the bottom of this shaft, to which this signaling apparatus ran. At the time of the accident, his work was below the nineteenth level. He testified that he performed his work near the shaft and would see any inspection made, and that he saw none, except when the signaling apparatus broke down. He further testified that the signal line did break down sometimes; that you could not tell when it would break; and that, in order to keep it in repair, it was necessary to inspect it, and that he would see any inspection made near the bottom of the shaft.

At the close of this part of his testimony, and just before his cross-examination, counsel for defendant moved the court to strike out his testimony "as to the inspection of the bell line signaling apparatus, on the ground that, under the declaration, the matter of inspection of the bell line is not competent and not being set up as one of the causes of the injury." Thereupon the court struck out all of the testimony of this witness regarding the inspection, "excepting he never saw them inspect between the eighteenth and nineteenth level." To this ruling error is assigned by plaintiff. Counsel for defendant was clearly in error as to the reason

for his objection, which the court sustained. The declaration clearly states, among other things, that it was the duty of defendant "to provide and maintain a proper and suitable signaling apparatus, including a reasonably safe signal bell line and bell for the purpose of notifying and conveying signals from the men underground to the engineer." The declaration also alleged a negligent failure to furnish and maintain such suitable signaling apparatus, and that it negligently failed to inspect and repair the same, which was a sufficient allegation to admit testimony relative to the inspection of the signaling apparatus by defendant.

This witness had testified that the signaling line broke down "once in a while;" that he never saw it inspected, except on such occasions; that his work was near the shaft for the term of two years, where he would see any inspection that was made at that place.

There is other testimony in the case bearing upon the question of the condition of the signaling apparatus at the time of this accident, which is undisputed. The skip came down past the eighteenth level, and upon the proper signal being given by Kemp, it stopped. Then, upon the signal to hoist slowly being given, that signal was complied with. Immediately following, the lever was turned over to another operator, who gave the proper signal to stop, at which there was but a brief stop, and the signal was repeated twice, when it stopped 40 feet beyond the level.

Assuming that the signaling apparatus ought to have been, from time to time, inspected, and assuming a failure to inspect it, there is no testimony tending to prove that it was not in working order; none tending to prove that a failure to inspect it caused or contributed to the injury. On the contrary, it is shown to have been in working order, and the hoist was operated in obedience to signals. Speculation only can

attribute the alleged erratic movement of the car to defective apparatus, and speculation would seem to halt at attributing the speculative defect to want of inspection. It is more reasonable to say that the engineer, in obeying signals, mismanaged the movement of the hoist, if, as is claimed by plaintiff, it did not stop, or stop long enough, for the men on his level to enter the car.

We are therefore of opinion that the court was right in directing a verdict for defendant, whether the testimony of Kemp is or is not considered.

BROOKE, C. J., and KUHN, STONE, BIRD, MOORE, and STEERE, JJ., concurred.

This case was originally assigned to the late Justice MCALVAY.